UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

STEPHENS INC.,
         Plaintiff/Counterclaim Defendant,

                    -v-

FLEXITI FINANCIAL INC.,
         Defendant/Counterclaim Plaintiff.

---

18-CV-8185 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff and Counterclaim Defendant Stephens Inc. ("Stephens") initiated this action

against Defendant and Counterclaim Plaintiff Flexiti Financial Inc. ("Flexiti"), asserting a single

claim for breach of contract.  (Dkt. No. 1 ¶¶ 38–48.)  Flexiti asserted two counterclaims against

Stephens in turn, for anticipatory repudiation of the contract and for breach of the implied

covenant of good faith and fair dealing.  (Dkt. No. 34 at 8–18 ("CC") ¶¶ 41–50.)  In doing so,

Flexiti demanded a jury trial.  (Dkt. No. 34 at 18.)

Stephens subsequently moved to strike Flexiti's demand for a jury trial, and to dismiss

Flexiti's counterclaims under Federal Rule of Civil Procedure 12(b)(6).  (Dkt. Nos. 35, 37.)

For the reasons that follow, the motion to dismiss is granted in part and denied in part, and the

motion to strike is denied.

## I.    Background

The factual background recited herein is taken from Flexiti's counterclaim complaint and

assumed true for purposes of this motion to dismiss.

"Flexiti is a financial technology private label credit card issuer . . . and a leading

provider of point-of-sale financing and payment technology."  (CC ¶ 8.)  On May 31, 2017,

Flexiti and Stephens entered into a contract whereby Stephens agreed to act as financial advisor

to Flexiti and provide a list of enumerated financial services in connection with a specific

transaction.  (CC ¶¶ 12–13.)  The transaction at issue was the "proposed acquisition by [Flexiti]

of a private label Canadian credit card portfolio of TD Financing Services, Inc." (the

"Transaction").  (Dkt. No. 34-1 ("Contract") at 1.)  In exchange for the anticipated financial

services, Flexiti agreed to pay Stephens $2.7 million if the Transaction was successfully closed

during Stephens's engagement under the contract, or within eighteen months after the

engagement was terminated.  (CC ¶ 14; Contract at 1–2.)

Flexiti alleges that "Stephens failed to adequately perform its duties as financial advisor."

(CC ¶ 20.)  Specifically, Flexiti states that in August 2017, it was engaged in negotiations with

Och-Ziff Capital Management Group ("Och-Ziff") regarding potential financing for the

Transaction, and negotiations with TD Financing Services, Inc. ("TD Financing") regarding

deadlines for the Transaction.  (CC ¶¶ 17–20.)  However, during this period, a Stephens vice

president who was Flexiti's primary contact—Bryan Pyne—went on vacation for an extended

period of time, and Stephens provided no interim contact was provided to step in and assist with

the negotiations.  (CC ¶¶ 20–21.)  Flexiti also alleges that Stephens promised to provide a

working model of financial implications for the Transaction, but the model Stephens produced

was "plagued with errors" and "ultimately unusable."  (CC ¶¶ 22–23.)  As a result, Flexiti had to

develop and pay for its own model, requiring the diversion of valuable resources during

negotiations.  (CC ¶ 23.)

Once Pyne returned from his vacation, Flexiti alleges that he "informed Flexiti that

Stephens 'had carried [its] fair share of water' and would not be doing any more work on an

acquisition for Flexiti."  (CC ¶ 24 (alteration in original).)  Flexiti's deal with Och-Ziff to fund

the purchase of the portfolio subsequently fell through, and Flexiti had to find new lenders and

negotiate new financing without the assistance of Stephens.  (CC ¶¶ 25–27.)  According to

Flexiti, because it ultimately had to locate financing to complete the Transaction without the

assistance of an experienced financial advisor, it "incurred significant expenses" and ended up

negotiating only "above-market interest rates," resulting in losses that would not have occurred

had Stephens performed competently under the Contract.  (CC ¶¶ 33, 36–39.)

On June 7, 2018, the Transaction was successfully closed, with Flexiti acquiring TD

Financing's portfolio valued at approximately $250 million.  (CC ¶ 10.)  That same day,

Stephens sent Flexiti an invoice for the $2.7 million fee agreed upon in the Contract, plus

$11,100.82 in expenses.  (Dkt. No. 1-2; *see* Dkt. No. 34 at 1–7 ("Answer") ¶ 36.)  Flexiti

responded by letter on June 8, 2018, in which, according to Stephens, Flexiti refused to pay the

invoice and threatened litigation.  (Dkt. No. 1 ¶ 37; Answer ¶ 37.)

Stephens initiated this action on September 7, 2018.  (Dkt. No. 1.)  Flexiti filed its initial

answer and counterclaim complaint on November 2, 2018 (Dkt. No. 13), and Stephens

subsequently moved to dismiss the counterclaims (Dkt. No. 28).  The Court held an initial

conference in this case on December 4, 2018, and on December 21, 2018, Flexiti filed the

operative amended answer and counterclaim complaint, including a jury trial demand.  (Dkt. No.

34.)  On January 2, 2019, Stephens moved to strike the demand for a jury trial (Dkt. No. 35), and

shortly thereafter, on January 10, 2019, Stephens moved to dismiss Flexiti's counterclaims (Dkt.

No. 37).  Those motions are now fully briefed and ready for resolution.

II.     **Motion to Dismiss**

        A.      **Legal Standard**

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007)).  The Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006) (quoting *Scutti Enters., LLC v. Park Place Entm't Corp.*, 322 F.3d 211, 214 (2d Cir. 2003)).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.  "[T]he duty of a court" in ruling on a motion under Rule 12(b)(6) "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Hogan v. Fischer*, 738 F.3d 509, 514 (2d Cir. 2013) (quoting *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 113 (2d Cir. 2010)).

### B.    Discussion

Stephens seeks to dismiss Flexiti's counterclaims on two grounds:  first, that the claims are barred by the Contract (Dkt. No. 38 at 5–8); and second, that Flexiti has failed to state a claim for anticipatory repudiation or breach of the implied covenant of good faith and fair dealing (Dkt. No. 38 at 8–12).  The Court discusses each ground in turn.

#### 1.    Contractual Bar

According to Stephens, the Contract bars Flexiti's counterclaims for two reasons.  First, Stephens contends, the Contract limits Stephens's liability to claims of gross negligence or willful misconduct, and Flexiti's contract-law counterclaims do not fall within these categories. (Dkt. No. 38 at 5–6.)  Second, Stephens argues, the Contract limits Stephens's liability to general damages, but the counterclaim complaint seeks consequential damages.  (Dkt. No. 38 at 7–8.)[1]

---

[1]    Stephens addresses as two separate arguments the Contract's purported limitations on (1) the species of claims and (2) the variety of damages for which it can be held liable.  (*See* Dkt. No. 38 at 5–8; Dkt. No. 48 at 4–5, 10.)  However, because these arguments

Flexiti responds that these arguments are based on an improper reading of the Contract.  (Dkt.

No. 47 at 5–11.)  The Court first considers the proper interpretation of the contractual provision

on which Stephens relies, and then addresses whether the Contract otherwise generally

indemnifies Stephens for any interparty claims.

> a.       **Interpretation of Purported Limitation-of-Liability Provision**

The agreement between the parties consists of a four-page engagement letter, with a

three-page "indemnification rider" attached as an exhibit.  (Contract at 2.)  The Contract provides

that Flexiti "agrees to indemnify and hold Stephens harmless in accordance with the

indemnification rider."  (*Id.*)  In arguing that the counterclaims are barred, Stephens relies on

Paragraph D of the indemnification rider, which provides:

> [N]o Indemnified Person shall have any liability to [Flexiti] for or in connection
> with the Agreement, except for liability for Damages which are finally, judicially
> determined to have resulted directly from the gross negligence or willful
> misconduct of the Indemnified Person.  In no event shall any Indemnified Person
> be responsible for any indirect, punitive, special or consequential damages, even if
> the Indemnified Person is advised of the possibility thereof.

(Contract at 6.)  Stephens reads this provision to mean that it cannot be held liable for any claims

brought by Flexiti that do not result from gross negligence or willful misconduct, or for any

consequential damages.  (Dkt. No. 38 at 5–8.)  Flexiti argues to the contrary that this provision

applies only to "disputes regarding Stephens'[s] right to indemnity."  (Dkt. No. 47 at 9–10.)

Read in isolation, Stephens is correct that the paragraph purports to bar the liability of

"Indemnified Person[s]" in general—except in specific circumstances—and the paragraph itself

does not expressly limit its application to indemnification disputes as opposed to other claims

between the parties.  But context is important to understanding the significance of this provision.

---

depend upon the interpretation of a single paragraph of the Contract, the Court considers the
purported limitations on claims and damages together as a single claimed limitation of liability.

It appears in the middle of Exhibit A, which the Contract refers to as the "indemnification rider" (Contract at 2), and which is titled "Indemnification and Contribution" (Contract at 5).  The paragraphs immediately preceding and following Paragraph D pertain to issues relevant to contribution and indemnification.  (Contract at 5–6.)  Structurally, the Court is not persuaded that a general limitation of liability—significantly limiting Stephens's liability to Flexiti in connection with its performance under the Contract—would be situated in the midst of the indemnification rider, as opposed to the agreement proper.

Moreover, the paragraph limits the liability of "Indemnified Person[s]."  (Contract at 6.) Stephens argues that this is merely a defined term—defined to include Stephens—and that the use of the term does not necessarily mean that the particular liability being limited relates to issues of indemnification.  (Dkt No. 48 at 4–5; *see* Contract at 5.)  Stephens is correct that courts look to the plain meaning of terms in a contract "[i]n the absence of a contractual definition." *Rank Grp. Ltd. v. Alcoa Inc.*, No. 12 Civ. 3769, 2018 WL 1388516, at \*19 (S.D.N.Y. Mar. 19, 2018).  But the existence of a contractual definition does not mean that courts must blind themselves to context, or to the particular term chosen by the parties.

Looking to the exact contractual definition given the term here, the relevant provision states:  "The Company will indemnify and hold harmless Stephens Inc. ('Stephens') and its affiliates, and their respective officers, directors, advisors, representatives, agents, employees, and each other person controlling Stephens or any of its affiliates . . . (each such party, including Stephens, an 'Indemnified Person') . . . ."  (Contract at 5.)  "Indemnified Person" is thus defined to mean one of an enumerated list of persons that Flexiti is agreeing to "indemnify and hold harmless."  (*Id.*)  The choice of this particular defined term—and its use throughout the indemnification rider but never in the agreement proper—serves to underscore the fact that the

provisions in the rider pertain to indemnification, and that Flexiti relates to Indemnified Persons

in these paragraphs as an indemnitor relates to an indemnitee.

Stephens also briefly argues that Flexiti's reading of Paragraph D should be rejected

because it would render the paragraph "superfluous and meaningless." (Dkt. No. 48 at 4.)  The

Court disagrees.  Paragraph A of the indemnification rider discusses Flexiti's indemnification of

Stephens and other Indemnified Persons, and Paragraphs B and C discuss reimbursement and

contribution in relation to that indemnification.  (Contract at 5–6.)  These paragraphs

contemplate a situation where, for example, Stephens is sued directly in connection to its work

under the Contract, and Flexiti must reimburse for the costs of the suit.  But Paragraph D can be

understood to contemplate a different scenario: where Flexiti is sued *directly* for the actions that

its agent, Stephens, took in connection with the agreement.  Under such circumstances,

Paragraph D provides that Stephens would be liable to Flexiti only for general damages resulting

from gross negligence or willful misconduct.  In this way, Flexiti's interpretation of Paragraph D

is neither superfluous nor meaningless.

Ultimately, based on its location within the indemnification rider and its repeated

references to "Indemnified Person[s]," the Court reads Paragraph D to unambiguously limit

Stephens's liability to Flexiti only with respect to claims for which Flexiti has agreed to

indemnify Stephens under Paragraph A.  Because Paragraph D is not a general limitation on

liability for any claims between the parties that are unrelated to indemnification, the Court rejects

Stephens's argument that Paragraph D bars Flexiti's counterclaims.

### b.        Interparty Indemnification

Even if the Court adopts Flexiti's interpretation of Paragraph D, however, Stephens

argues that Flexiti nonetheless agreed to indemnify Stephens for any interparty claims.  (Dkt. No.

48 at 3–4.)[2] This argument posits that, under Paragraph A of the indemnification rider, Flexiti

agreed to indemnify Stephens for any claims against it brought by third parties ("third-party

claims")—and for any claims brought by Flexiti itself ("interparty claims").

Under New York law, "[w]hen a party is under no legal duty to indemnify, a contract

assuming that obligation must be strictly construed to avoid reading into it a duty which the

parties did not intend to be assumed." *Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d

487, 491 (1989).[3]  The determination of whether parties intended to indemnify against only

third-party claims, or interparty claims as well, "turns on the purpose of the indemnification

agreement as unmistakably evidenced by the language of the agreement and the surrounding

facts and circumstances." *Sequa Corp. v. Gelmin*, 851 F. Supp. 106, 110 (S.D.N.Y. 1994) (citing

*Hooper Assocs.*, 74 N.Y.2d at 491–92).  In order to interpret a contract to allow for interparty

indemnification, the language and circumstances must "support a clear implication of an

unmistakable intent to indemnify" against interparty claims.  *Haynes v. Kleinewefers & Lembo

Corp.*, 921 F.2d 453, 457 (2d Cir. 1990).

The indemnification clause at issue here—Paragraph A of the indemnification rider—

provides:

> [Flexiti] will indemnify and hold harmless Stephens Inc. ("Stephens") and its
> affiliates, and their respective officers, directors, advisors, representatives, agents,

---

[2]     Stephens also briefly contends that Flexiti's arguments about a lack of interparty indemnification fail as a matter of law, because most of the cases considering the issue involve claims for attorney's fees only, and not substantive claims between the parties.  (Dkt. No. 48 at 2–3.)  But this is a distinction without a difference.  In considering whether indemnification agreements allow for attorney's fees in interparty disputes, courts ask whether indemnification applies to interparty claims generally.  *See Sequa Corp. v. Gelmin*, 851 F. Supp. 106, 110 (S.D.N.Y. 1994) ("The question is whether claims asserted by the indemnitor . . . unmistakably are included within th[e] broad language [of the indemnification clause] or whether the parties intended only to cover claims asserted by strangers ('third parties') to the agreement.").

[3]     Both parties agree that New York law applies to this case, and so the Court assumes its application as well.  (Dkt. No. 38 at 5; Dkt. No. 47 at 7–8.)

employees . . . (each such party, including Stephens, an "Indemnified Person"), from and against any and all losses (other than loss of profits), claims, damages and liabilities, joint or several (collectively, "Damages"), related to or arising out of any matter referred to in the engagement letter to which this Exhibit is appended (the "Agreement"), including an Indemnified Person's services thereunder, except to the extent such Damages are finally, judicially determined to have resulted directly from the gross negligence or willful misconduct of an Indemnified Person.

(Contract at 5.)

Flexiti contends that the parties' indemnification agreement applies to third-party claims only, because Paragraph A and the rest of the indemnification rider do not "unmistakably demonstrate an intent" to cover interparty claims.  (Dkt. No. 47 at 8–9.)  Stephens argues to the contrary that Paragraph A should be read to require interparty indemnity, because subsequent provisions of the indemnification rider—Paragraphs D and H—refer to claims between the parties.  (Dkt. No. 48 at 3.)  However, due to their location and references to "Indemnified Person[s]" (*see supra* Section II.B.1.a), the Court reads these subsequent paragraphs to govern any interparty disagreements regarding the scope of indemnification or contribution.  These subsequent provisions do not unmistakably indicate the parties' intent to expand the scope of indemnification to encompass interparty disputes generally.

Stephens also argues that the indemnification clause itself, Paragraph A, is expansive enough that it should be read to cover interparty disputes, because it applies to all claims related to Stephens's "services" under the Contract.  (Dkt. No. 48 at 3–4.)  But *Hooper*, the seminal New York Court of Appeals case establishing the presumption that indemnification agreements do not cover interparty claims, also included an indemnification clause that applied to all claims arising out of "the performance of any service to be performed" under the contract at issue.  *Hooper Assocs.*, 74 N.Y.2d at 492.  *Hooper* nonetheless concluded that this statement did not "unequivocally refer[] to claims between the parties themselves."  *Id.*  And other courts applying

9

New York law have repeatedly held that expansive language in an indemnification clause nonetheless does not encompass interparty disputes unless there is clear indication that the parties had such an intent.  *See, e.g.*, *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 21 (2d Cir. 1996); *Island Two LLC v. Island One, Inc.*, No. 13 Civ. 2121, 2015 WL 1026495, at \*6–7 (S.D.N.Y. Mar. 9, 2015); *Abakan, Inc. v. Uptick Capital, LLC*, 943 F. Supp. 2d 410, 416 (S.D.N.Y. 2013); *Sequa Corp.*, 851 F. Supp. at 110–11.

Moreover, as Flexiti notes, the indemnification rider contains at least two provisions—a notification requirement in Paragraph E and a settlement consultation requirement in Paragraph F—that are unmistakably applicable to third-party claims only.  (Dkt. No. 47 at 9.)  The existence of such notification requirements—and "other provisions in the contract which unmistakably relate to third-party claims" and have "no logical application to a suit between the parties"—supports interpreting an indemnification clause to apply to only third-party claims. *Hooper Assocs.*, 74 N.Y.2d at 492–93; *see Abakan, Inc.*, 943 F. Supp. 2d at 416.

Stephens nonetheless argues that the indemnification provision here is broad and should be read to encompass interparty claims.  (Dkt. No. 48 at 3–4.)  But the two cases Stephens relies on for support did not involve provisions that unmistakably relate to third-party claims but not interparty claims.  *See In re Bridge Constr. Servs. of Fla., Inc.*, No. 12 Civ. 3536, 2016 WL 4625687, at \*3 (S.D.N.Y. Sept. 6, 2016) (not mentioning any such provisions); *Crossroads ABL LLC v. Canaras Capital Mgmt., LLC*, 963 N.Y.S.2d 645, 647 (App. Div. 1st Dep't 2013) (noting the lack of "any other provisions in the servicing agreement that would be rendered meaningless if the indemnification provision is read to include any claims").  Those courts that have interpreted indemnification agreements to cover interparty claims thus had before them contracts meaningfully distinguishable from the agreement at issue here.

Reading the indemnification rider as a whole, in light of the duty to strictly construe such provisions, the Court concludes that there is no "clear implication" from the agreement "of an unmistakable intent to indemnify" against interparty claims.  *Haynes*, 921 F.2d at 457. Therefore, Flexiti is not required to indemnify Stephens for any breach of contract claims between the parties.

* * *

The Court thus rejects Stephens's arguments that Flexiti's breach of contract counterclaims are barred by a limitation of liability provision—or effectively barred by the indemnification provision—in the Contract.

### 2.      Failure to State a Claim

Stephens next argues that Flexiti has failed to adequately plead its counterclaims.  (Dkt. No. 38 at 8–12.)  The Court addresses each counterclaim in turn.

### a.      Anticipatory Repudiation

"Under New York law, '[a]nticipatory repudiation occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty.'"  *In re Best Payphones, Inc.*, 432 B.R. 46, 54 (S.D.N.Y. 2010) (alteration in original) (quoting *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002)).  "The declaration must be 'positive and unequivocal' in order to constitute an anticipatory repudiation."  *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 950 F. Supp. 2d 568, 619–20 (S.D.N.Y. 2013) (quoting *Tenavision, Inc. v. Neuman,* 45 N.Y.2d 145, 150 (1978)).  "Whether a particular communication or act constitutes repudiation of a contract generally presents a question of fact."  *In re Best Payphones, Inc.*, 432 B.R. at 55.  "An exception applies where the repudiation is in writing"— and the meaning of the written expression is unambiguous—"in which case the court may resolve the issue of repudiation 'as a matter of law.'"  *DiFolco*, 622 F.3d at 112.

11

Here, Stephens argues that the counterclaim complaint "alleges no facts whatsoever indicating that Stephens ever made a positive and unequivocal refusal to perform the entire contract." (Dkt. No. 38 at 9.)  In response, Flexiti identifies factual allegations in the counterclaim complaint regarding two particular communications, which it characterizes as statements of repudiation. (Dkt. No. 47 at 14.)  Specifically, the counterclaim complaint alleges that, after Pyne returned from vacation, he "informed Flexiti that Stephens 'had carried [its] fair share of water' and would not be doing any more work on an acquisition for Flexiti." (CC ¶ 24 (alteration in original).)  And the counterclaim complaint further alleges that, after funding from Och-Ziff fell through, "Stephens said it did not believe that Flexiti would be able to raise sufficient equity to fund the transaction and Stephens gave up on the deal and on its client. . . . Stephens stopped identifying and pursuing potential lenders, formulating negotiation strategies and conducting negotiations, and performing other services under the Contract." (CC ¶ 26.)

Focusing on the first alleged communication, Stephens argues that it does not show a clear refusal to perform under the contract, because another alleged repudiation occurred after the Och-Ziff funding fell through and the counterclaim complaint "shows that Stephens continued to provide support" after the Pyne communication. (Dkt. No. 38 at 9; *see* Dkt. No. 48 at 6.)  The Court disagrees with this characterization of Flexiti's allegations.  The counterclaim complaint does not specify precisely when the communication from Pyne was received in relation to when the Och-Ziff deal fell apart, and it does not specifically allege that Stephens was continuing to perform under the Contract in the interim.  And significantly, as Flexiti notes (Dkt. No. 47 at 14, Stephens does not address the allegations that Stephens's statement and actions after the Och-Ziff funding fell through amount to repudiation.

Moreover, there is no allegation that either alleged repudiating communication was made

12

in writing.  Therefore, whether the communications and acts alleged in the counterclaim

complaint constitute clear and unequivocal repudiation of the Contract presents a question of fact

that the Court is unable to resolve at this stage in the litigation.  *See DiFolco*, 622 F.3d at 112.

Stephens's request to dismiss Flexiti's anticipatory repudiation claim for failure to properly

allege the refusal to perform under the Contract is thus denied.

Stephens also briefly argues that the anticipatory repudiation claim must be dismissed as

a matter of law because the Contract was terminable at will.  (Dkt. No. 38 at 10; Dkt. No. 48 at

7–8.)  Flexiti disagrees, arguing that, under New York law, anticipatory repudiation claims are

applicable to contracts terminable at will if the contract was not properly terminated.  (Dkt. No.

47 at 16–17.)

Stephens responds that the cases on which Flexiti relies do not establish that a claim for

*anticipatory repudiation*—as opposed to breach of a specific contractual provision—can be

premised on a contract terminable at will.  (Dkt. No. 48 at 8.)  Indeed, the cases on which Flexiti

relies stand for the more limited proposition that a standard breach of contract claim can be

brought, even if an underlying contract was terminable at will, so long as the termination was not

properly effected before the alleged breach.  *See BBS Power Mod, Inc. v. Prestolite Elec., Inc.*,

71 F. Supp. 2d 194, 198–200 (W.D.N.Y. 1999); *Walck Bros. Ag. Serv. v. Hillock*, 774 N.Y.S.2d

218 (App. Div. 4th Dep't 2004); *RenerGlobe, Inc. v. Ne. Biofuels, LLC*, 890 N.Y.S.2d 370

(Table), 2009 WL 1929090, at *5 (N.Y. Sup. Ct. 2009).

As the moving party, however, Stephens has the burden of demonstrating its entitlement

to relief under Rule 12(b)(6).  *See Leon v. Rockland Psychiatric Ctr.*, 232 F. Supp. 3d 420, 426–

27 (S.D.N.Y. 2017).  And Stephens has not cited a single case in which a court dismissed an

anticipatory repudiation claim under New York law on the basis that the underlying contract

permitted termination at will.  Therefore, the Court is not prepared to hold at this time that

Flexiti's anticipatory repudiation counterclaim is barred as a matter of law due to the nature of

termination permitted under Contract.

### b.       Breach of Implied Covenant of Good Faith and Fair Dealing

Stephens also moves to dismiss the implied-covenant counterclaim on the grounds that it

was duplicative of the anticipatory repudiation counterclaim and otherwise inadequately pleaded.

(Dkt. No. 38 at 10–12.)

"New York law . . . does not recognize a separate cause of action for breach of the

implied covenant of good faith and fair dealing when a breach of contract claim, based upon the

same facts, is also pled."  *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013)

(ellipsis in original) (quoting *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d

Cir. 2002)).  Where a breach of contract claim is "based on the same facts" as an implied-

covenant claim, "the latter claim should be dismissed as redundant."  *Id.*

"However, where an allegation of a violation of the covenant of good faith and fair

dealing alleges separate conduct from that underlying a concurrent claim for breach of contract,

the two claims are not duplicative."  *Joshi v. Trustees of Columbia Univ. in City of N.Y.*, No. 17

Civ. 4112, 2018 WL 2417846, at \*7 (S.D.N.Y. May 29, 2018).  Therefore, "[a]n implied-

covenant claim can survive a motion to dismiss only if it is based on allegations different than

those underlying the accompanying breach of contract claim and the relief sought is not

intrinsically tied to the damages allegedly resulting from the breach of contract."  *Alaska Elec.*

*Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 63 (S.D.N.Y. 2016) (citation omitted).

Flexiti argues that the counterclaims are not redundant here, because they are based on

"two sets of allegations [that] are separate and distinct":  allegations that Stephens repudiated the

14

Contract, and allegations that Stephens's conduct prior to repudiation was substandard.  (Dkt. No. 47 at 20–21.)  Even assuming that the two sets of allegations outlined by Flexiti could give rise to nonduplicative claims, however, the Court does not read the counterclaim complaint itself to contain a distinct set of allegations for each of the claims.

The allegations giving rise to distinct sets of facts according to Flexiti (Dkt. No. 47 at 21), are actually part of a single, continuous factual narrative with no indication that they are intended to support separate claims (CC ¶¶ 18–27).  And the two counts in the counterclaim complaint, specifically, incorporate the same factual allegations (CC ¶¶ 41, 46), and are expressly premised on substantially overlapping conduct (*compare* CC ¶ 44, *with* CC ¶ 48).  Moreover, the two counts allege that Flexiti sustained identical damages as a result of both the anticipatory repudiation and the breach of the implied covenant.  (CC ¶¶ 45, 50.)

Because Flexiti seeks identical relief under both counts, the implied-covenant counterclaim is duplicative of the anticipatory repudiation counterclaim.  Therefore, Flexiti's implied-covenant counterclaim must be dismissed.

### III.    Motion to Strike Jury Demand

At the end of the amended counterclaim complaint, Flexiti interposes a demand for a jury trial.  (Dkt. No. 34 at 18.)  Stephens moves to strike the demand, arguing that Flexiti waived the right to a jury trial in the Contract.  (Dkt. No. 36 at 2.)

"[T]he Seventh Amendment right to a jury trial is 'fundamental' and a presumption exists against waiver of that right."  *Kortright Capital Partners LP v. Investcorp Inv. Advisers Ltd.*, 327 F. Supp. 3d 673, 685 (S.D.N.Y. 2018).  As a result, a contractual waiver of that right is enforceable only "if it is made knowingly, intentionally, and voluntarily."  *Merrill Lynch & Co v. Allegheny Energy, Inc.*, 500 F.3d 171, 188 (2d Cir. 2007).  "[T]he party seeking to enforce the jury waiver clause bears the burden of showing that the waiver was knowing and voluntary."

*Kortright*, 327 F. Supp. 3d at 685.  In determining whether to enforce a waiver clause by striking

a jury demand, courts consider two inquiries: first whether the clause is enforceable—*i.e.*,

"whether waiver is knowing and voluntary"—and second, "whether the claims in the action fall

within the scope of the jury waiver clause."  *Id.* at 685–86.

The contractual provision on which Stephens relies is Paragraph H from the

indemnification rider, which states:  "Any right to trial by jury with respect to any dispute as to

the respective rights and obligations of [Flexiti] and any Indemnified Person is hereby waived."

(Contract at 7.)  In its brief in support of the motion to strike, Stephens focused entirely on the

first inquiry, arguing that the waiver provision was enforceable.  (Dkt. No. 36 at 3–6.)  In its

response, however, Flexiti focused primarily on the second inquiry, arguing that the breach of

contract claims between the parties do not fall within the scope of this specific waiver clause.

(Dkt. No. 47 at 12.)[4]  Assuming that the waiver is enforceable, the Court addresses its scope.

State substantive law "applies to the interpretation of the scope of the jury waiver

provisions" in a contract.  *Kortright*, 327 F. Supp. 3d at 685.  In defining their scope,

"contractual provisions containing jury trial waivers should be 'narrowly construed.'"  *Id.* at 686.

"Nonetheless, the plain language of 'enforceable waiver provisions must be construed literally.'"

*Id.* (quoting *Wechsler v. Hunt Health Sys., Ltd.*, No. 94 Civ. 8294, 2003 WL 21878815, at *3

(S.D.N.Y. Aug. 8, 2003)).

As with the purported limitation-of-liability provision (*see supra* Section II.B.1.a),

viewing the text of the waiver provision in isolation would seem to support Stephens's

---

[4]      Stephens does not specifically respond to Flexiti's arguments about the scope of
the waiver in its reply brief.  (*See* Dkt. No. 48 at 5–6.)  But because this question mirrors that of
the purported limitation-of-liability clause, which Stephens did address in its reply (Dkt. No. 48
at 4–5), the Court does not consider this issue to have been forfeited.

interpretation of the clause to apply to any dispute between the parties.  (Dkt. No. 48 at 1.)  The waiver encompasses "any dispute as to the respective rights and obligations of [Flexiti] and any Indemnified Person" (Contract at 7), and "Indemnified Person" includes Stephens (Contract at 5).  However, as discussed above, this waiver clause occurs within the indemnification rider, and pertains to the rights and obligations of "Indemnified Person[s]," who are defined by their status as indemnitees in relation to Flexiti.  And a dispute between an "Indemnified Person" and an indemnitor about their "respective rights and obligations" is most naturally understood to relate to indemnification.

The Court thus holds that, through the Paragraph H waiver clause, the parties unambiguously agreed to waive their right to trial by jury only in disputes over their rights and obligations *with respect to indemnification*.  Accordingly, the instant dispute involving breach-of-contract claims is outside the scope of the waiver, and the motion to strike the jury demand is denied.

## IV.    Conclusion

For the foregoing reasons, Stephens's motion to dismiss is GRANTED in part and DENIED in part, and Stephens's motion to strike is DENIED.  Stephens shall file an answer to the remaining counterclaim by July 22, 2019.

The Clerk of Court is directed to close the motions at Docket Numbers 35 and 37.

SO ORDERED.

Dated: July 1, 2019
       New York, New York

_____
                 J. PAUL OETKEN
              United States District Judge